| | |
|---|---|
| **UNITED STATES OF AMERICA** | DOCKET NO. 3:25-CR-182-KDB |
| **v.** | |
| **SHADY ABEDELHADY HEGAZY,**<br>**Defendant.** | |

### THE UNITED STATES' RESPONSE IN OPPOSITION
### TO DEFENDANT'S MOTION TO SUPPRESS

### I. <u>SUMMARY OF ARGUMENT</u>

Defendant SHADY ABEDELHADY HEGAZY ("Defendant") was observed by law enforcement via a close circuit camera outside a "Fast Mart" Convenience Store ("store") located at 7020 Lawyers Road. Law enforcement knows this location is a high crime area where a significant amount of drug trafficking occurs. On March 6, 2025, officers watched for over thirty minutes as Defendant sat in his car for no apparent purpose, all while other individuals arrived, entered, and exited the store in short order. After thirty minutes, Defendant engaged in multiple hand-to-hand transactions with Johnathan Stevenson ("Stevenson"), which officers recognized to be a drug transaction. Defendant then entered the store and exited in less than a minute, and handed Stevenson another item before both left the area of the store. Stevenson left the area on foot, while Defendant left the area in his vehicle. Officers then conducted an investigative stop of Defendant. Upon walking up to Defendant's car, officers smelled marijuana coming from the car. This smell gave them probable cause to search the vehicle under the automobile exception. Based on these facts, both the investigative stop of Defendant and the search of Defendant's automobile were legal. Defendant's motion to suppress (Doc. 20) should be denied.

1

## II. <u>FACTS</u>

On March 6, 2025, officers with the Charlotte Mecklenburg Police Department ("CMPD") were conducting surveillance via a close circuit camera[1] ("CCTV") on the Fast Mart ("Store"). The CCTV was located on a nearby building and was not readily apparent to individuals at the store. The video feed was being live-monitored and controlled by CMPD Officer E. Seymour. The store is in a high crime/high drug area and is known to be an open-air market for drug transactions.[2] The location has a barber shop and laundromat; however there does not appear to be a mixing of clientele. In the relevant thirty minutes, drivers of vehicles parking in front of the store either entered the store, or had passengers enter the store.

**EVENTS AT THE STORE**: times (approximate) (Defendant and Stevenson bolded).

(00:10)- **Defendant arrives and backs into a parking spot in front of the store. Defendant remains in his car, parked in front of the store for more than 30 minutes. Defendant opens the driver door occasionally to talk to people, but never exits the vehicle for more than 30 minutes.**

(1:53)- **An individual, later identified as Johnathan Stevenson ("Stevenson") enters the parking lot on foot, walking a dog.**

(2:10)- **Stevenson talks to Defendant for about 20 seconds before leaving the parking lot on foot, having never entered the store.**

(2:35)- A man exits the store and enters the passenger side of a red truck before the truck leaves the location.

(3:45-5:53)- A man and women are parked on the passenger side of Defendant's car and talk outside their vehicles for about for about a minute. The man then gives the woman a leaflet, and then walks into the barber shop briefly, where he appears to have left a stack of leaflets.

(7:10)- The man with the leaflets leaves the parking lot in his vehicle.

(10:23)- A black car enters the parking lot, parks in front of the store, and the driver enters the

---

[1] The Government will reference the running times on "Defense Exhibit A".

[2] Officer DelCerro is aware that there have been numerous robberies/shootings, and a pattern of narcotics dealing at this location.

store.  The driver then exits the store approximately a minute later with a bag, before driving away from the location.

(11:00)- A man pulling a trailer enters the store parking lot.  He enters the store and later begins off-loading items from the trailer into the store.

(13:08)- An SUV arrives and parks next to the passenger's side of Defendant's car.  The driver remains in his vehicle for four minutes, does not talk to anyone, then leaves.

(13:36)- A black SUV arrives and parks in a spot on the driver's side of Defendant's car.  The driver exits the vehicle and enters the store.  Two minutes later, the driver exits the store and drives away.

(18:45)- A small black SUV parks on the passenger side of Defendant's vehicle.  The driver exits the vehicle and enters the store.  Two minutes later, the driver exits the store and opens his passenger door, before briefly approaching Defendant and talking to him for about 20 seconds.  At one point this individual leans behind the open door of Defendant's vehicle, but no hand-to-hand transaction is clearly visible.  The individual then gets in his vehicle and leaves the location.

(21:45)- A woman in a light blue sweatsuit appears and walks by Defendant.  She then walks over to Defendant and talks to him for about a minute before walking into the store.  Defendant remains seated in his vehicle the entire time as he talks to the woman.  The woman exits the store about three minutes later with a grocery bag and leaves the location on foot.

(22:40)- A black SUV parks on the driver's side of defendant's vehicle and two passengers get out of the vehicle and enter the store.  The passengers re-emerge from the store 7 minutes later carrying grocery bags and re-enter the vehicle.  The vehicle then leaves the location.

(23:40)- A woman with a reflective-vest walks through the parking lot and enters the store.  She exits the store approximately one minute later and leaves the location.

(27:00)- a small grey SUV parks on the passenger's side of the defendant's vehicle and the driver enters the store.  He then exits the store three and a half minutes later, enters his vehicle, and leaves the location.

(28:14)- A woman in a black jacket enters the store.  She leaves the store two minutes later carrying a bag and leaves the location.

(28:55)- A grey minivan arrives in the parking lot and the driver enters the store.

(29:00)- a black car arrives in the parking lot and parks on the other side of the grey SUV that is parked on Defendant's passenger side.  Two minutes later, he exits the store and leaves the location.

(32:00)- **Stevenson arrives back at the location with his dog.  The camera zooms in and Stevenson is not visible.**

3

(33:00)- **Stevenson is seen exiting the store with his dog.**



(33:20)-**Hegazy** *(above)* **holds out his hand in a rear-cupped manner while remaining seated in his car. This is not a typical handshake manner. An item appears to be handed off.**



(33:26)- **a second hand to hand transaction occurs between Hegazy and Stevenson** (above)**.**

4



(33:35- 33:37) - **Stevenson hands money to Hegazy. The interaction with Hegazy and Stevenson at his car lasted less than 20 seconds and resulted in three hand-to-hand transactions.**



(33:52) - **Hegazy enters the store as Stevenson waits on the corner.**



(34:24)- **another handoff between Hegazy and Stevenson.**

(35:00)- **Both Stevenson and Hegazy leave the location.**

**<u>EVENTS AFTER LEAVING THE STORE</u>**

(1:54:55 pm)[3] - An investigative stop is conducted on Defendant.  As the officer approached, he began speaking to Hegazy through the back window before Defendant opened the door and got out of the car at the officer's request.

(1:55:40 pm)- The officers handcuffed Defendant and Officer DelCerro asked Defendant if he had "been smoking in the car".[4]  His response is not audible on Government Exhibit 1; however, he is heard to respond "yes, sir" to the question on Officer Torres' body worn camera.[5]  Officer DelCerro then hands defendant off to Officer Torres, who takes him to stand at the back of Defendant's vehicle.

(1:56:00 pm)- Defendant attempts to continuously talk to Officer Torres, who states they will talk in a second after he reads him "his rights".

    -Defendant:  *[intelligible] what'd I do wrong?*

---

[3] The time according to the Body Worn Cameras.  Officer DelCerro's body worn camera is Government Exhibit 1.

[4] The Officer did not specify whether he meant marijuana or other smoking products.

[5] Officer Torres' Body Worn Camera is Government Exhibit 2.

6

-Officer Torres: [after inquiring about the vehicle registration stated] *Well, immediately we smelled a strong odor of marijuana and there's baggies all over your back seat ..."*[6]

-Defendant: *ya'll smelled it* [marijuana] *from driving behind me*?

-Officer Torres: *No, we smelled it right there* [pointing at the vehicle].

(1:56:29 pm)- Officer DelCerro discovers marijuana in the center console.



(*Marijuana discovered.*)

(2:02:55 pm)- Officer DelCerro discovers a Kel-Tec P-11 Pistol.

Defendant was later questioned and, after signing a waiver form, made incriminating statements concerning the firearm.

### III. LEGAL ARGUMENT

Police were conducting surveillance of the Fast Mart store via a close circuit camera and saw Defendant engage in a narcotics transaction. Based on this information, police made a legal investigative stop of Defendant.

A. <u>There was reasonable suspicion to make an investigative stop of defendant.</u>

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures," *U.S. Const. amend. IV*. "The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of

---

[6] Government Exhibit 2, 1:56:17 pm.

individuals." *United States v. Drakeford,* 992 F.3d. 255, 262 (4th Cir. 2021)*; citing, United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976).

"The protection against unreasonable seizures includes brief investigatory stops." *Drakeford,* 992 F.3d. at 262; *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc) (internal quotation marks omitted). In *Terry v. Ohio*, the Supreme Court held that a police officer may conduct a brief investigatory stop based on reasonable, articulable suspicion that criminal activity is afoot. *Id., See* 392 U.S. 1, 30 (1968); *Curry*, 965 F.3d at 320. But in a *Terry* stop, "[an] officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013) (quoting *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009)). "Seemingly innocent factors, when viewed together, can amount to reasonable suspicion." *Foster*, 824 F.3d at 89. But "the presence of additional facts might dispel reasonable suspicion." *Kansas v. Glover*, 589 U.S. 376, 386 (2020). Courts are "skeptical of Government attempts to spin ... largely mundane acts into a web of deception." *Foster*, 824 F.3d at 89 (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22.

Presence in a "high crime area" is a relevant contextual consideration but cannot alone create reasonable suspicion of criminal activity. *See United States v. Curry*, 965 F.3d 313, 330 (4th Cir. 2020) (en banc); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[P]resence in an area of expected criminal activity, standing alone, is not enough to support a reasonable particularized

Case 3:25-cr-00182-KDB-DCK     Document 25     Filed 05/29/26     Page 8 of 17

suspicion that the person is committing a crime."). The court reasons that "presence in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry." *United States v. Massenburg*, 654 F.3d 480, 488 (4th Cir. 2011) (cleaned up).

Ordinary gestures, like a handshake, must be accompanied by additional observations, like drugs, money, or concealment, for an officer to reasonably conclude that a drug transaction has taken place. *See Drakeford*, 992 F.3d at 264; *Foster*, 634 F.3d at 247–48. Other additional observations that the court has found suggestive of drug transactions include brief hand-to-hand contact with multiple people and the absence of any meaningful interaction or conversation during those encounters. *See, e.g., United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010) (finding an officer had reasonable suspicion that a person was selling drugs when the officer witnessed that individual making hand-to-hand contact with multiple people without lingering or engaging in conversation with them). But without such specific identifiers, we would be left to rely exclusively on the testimony of the officers,"[b]ut the success or failure of a suppression motion cannot hinge on an officer saying, in essence, 'I know it when I see it,' " *Drakeford*, 992 F.3d at 267 (Wynn, J., concurring).

In this case, there was reasonable suspicion to justify an investigative detention of Defendant, which subsequently led to a vehicle search after officers smelled the odor of marijuana. First, Defendant parked for more than thirty minutes in a high crime, high drug location. Defendant attempts to dismiss the importance of this fact by claiming that stores, such as the Fast Mart, are locations where people are known to loiter. However, as noted in the factual section, this store had significant vehicle and foot traffic in the thirty-three minutes that Defendant was present. During that time, numerous people parked in front of the store or walked up to the store. With the exception of a single person, who remained in his car for four minutes before leaving,

9

the visitors to the store either entered the store, or had passengers enter the store, and then left in a relatively short period of time. Most of the individuals had bags upon leaving the store, a clear indication they had shopped at the store. The only person to loiter for any significant amount of time was Defendant. This loitering in a high drug, high crime area is suspicious.

Secondly, Defendant's interaction with Stevenson is also suspicious. Stevenson first approaches Defendant approximately two minutes into the video and talks to Defendant for about 20 seconds before Stevenson leaves the location. During this time, Defendant and Stevenson did not exchange a handshake or engage in any physical contact. Defendant would then wait at the location for approximately thirty minutes until Stevenson returns. Upon returning, Stevenson and Defendant would again interact for about twenty seconds, but on these occasions would engage in three separate hand-to-hand transactions. In the first hand-to-hand transaction, defendant would remain seated in his vehicle with his hand reaching backwards in a cupped fashion, as though holding something. *(Photo 1, below)* The manner in which the Defendant holds his hand is inconsistent with a handshake.

 (*Photo 1*)

Then, about four seconds after the first hand-to-hand transaction, Defendant again reaches back to Stevenson, who again reaches out and the two individuals appear to quickly exchange

items once again.  (*Photo 2*, below) The conduct, with Defendant reaching backwards while remaining seated is inconsistent with a handshake.



(*Photo 2*)

Finally, Stevenson rifles around his own pocket before pulling out what appears to be cash and handing it over to Defendant. *(Photo 3, below)*.  The manner in which Stevenson is holding out the cash, and Hegazy is accepting it while still seated, is inconsistent with a handshake.



(*Photo 3*)

All three of the initial hand-to-hand transactions take approximately twenty seconds total. After this interaction, Stevenson walks away and stands on the corner of the store and waits. Defendant then enters the store without Stevenson.  Approximately 30 seconds later, Defendant exits the store and makes another hand-to-hand transaction with Stevenson.  When evaluating the totality of the circumstances, the facts indicate that Defendant made initial contact with Stevenson and Stevenson ordered some drugs.  Likely Stevenson  went to obtain cash from a different location

11

and arrived thirty minutes later. Defendant had remained seated in his vehicle the entire time and, upon Stevenson arriving, conducted three quick hand-to-hand transactions. Once the transaction was complete, Defendant entered the store (likely to get change) and upon exiting the store made another hand-to-hand transaction with Stevenson. In total, there were four hand-to-hand transactions in just over one minute. Both Defendant and Stevenson quickly left the store after the final transaction. Based on these recorded facts, there was reasonable suspicion to conclude that a drug transaction had occurred.

B.     The case of United States v. Drakeford is distinguishable from the current case.

Defendant cites *United States v. Drakeford* (992. F.3d. 255, 4th Cir. 2021) as a basis for determining that reasonable suspicion did not exist in the current case; however, *Drakeford* is easily distinguishable. *Drakeford* involved a confidential informant ("CI") who indicated that Drakeford was dealing narcotics, although the CI initially only gave a license plate number. Police never qualified this CI or explained why they believed the CI to be reliable, and police had difficulty independently corroborating information provided by the CI. Once police located Drakeford, they did not see him engaging in drug trafficking, despite surveilling him thirty times at an identified address. 992 F.3d. at 258. On one occasion, officers saw an individual enter Drakeford's vehicle for 30-45 seconds, leading police to believe that a drug transaction had occurred. When police stopped this individual no drugs were found, merely drug paraphernalia. 992 F.3d at 258-259. On a different day, police followed Drakeford to a house and saw him exit the house with a bag. After having received the bag, Drakeford called the CI and indicated he had drugs; however, police did not attempt a controlled purchase to confirm the CI's information. 992 F.3d at 259, 264.

Finally, on February 18, 2018, Drakeford went to the "Car Stereo Warehouse," which was

not located in a high crime/high drug area, and parked directly in front of a security camera. Drakeford met with two other males and later engaged in "two quick handshakes" outside of the vehicle, the second of which a detective believed to be a hand-to-hand narcotics transaction. 992 F.3d at 260. A detective testified that the first hand shake was "consistent with how appellant [Drakeford] meets people in public." After this, Drakeford and the men entered the stereo warehouse and shopped for approximately 10-15 minutes. 992 F.3d at 260. After leaving the store, the men "continued to meet." *Id.* At this time, the police entered the parking lot and detained Drakeford and the other men.

The Fourth Circuit ultimately found numerous issues with the reasonable suspicion in *Drakeford.* The Court cautioned not to overlook facts that are in the police's possession and which tend to dispel reasonable suspicion. Notably, a CI gave information that could not be independently corroborated; police previously saw what they concluded to be a drug transaction, but follow up investigation did not corroborate the presence of drugs; a single officer saw what he labelled as a hand-to-hand transaction but did not see anything exchanged; the interaction took place in a public place, outside of the vehicle, and in front of a security camera; and Drakeford went into the "car stereo warehouse" with the other men to shop, rather than immediately leaving the scene. 992 F.3d. at 258. These concerns do not exist in the current case.

In this case, the police did not have any information that would tend to dispel the Defendant's suspicious behavior. Rather, they saw Defendant loitering for more than thirty minutes in a high crime/high drug area; and Defendant was behaving in a manner that was noticeably different from the other customers at the store, who arrived, entered the store, and then left. The police also recorded the interactions in the current case. Here, Defendant met with Stevenson and then waited more than thirty minutes for him to return, at which time they engaged

13

in three hand-to-hand transactions where items were clearly exchanged. These hand-to-hand exchanges took approximately twenty seconds and did not occur in the open, but rather occurred with Defendant still seated in his vehicle and opening his door slightly to awkwardly pass items to Stevenson. CCTV being present is also irrelevant since Defendant would not have been aware that he was being recorded by a camera placed on a neighboring building and controlled by police. Lastly, as soon as the transactions were complete, the men separated and Defendant entered the store for approximately 30 seconds before exiting, handing Stevenson something, and then both individuals left the location. These facts are markedly different from the *Drakeford* case and clearly establish reasonable suspicion.

      C.     <u>There was probable cause to search Defendant's vehicle under the automobile exception.</u>

"'Under the Fourth Amendment, law enforcement officers are generally required to obtain a warrant before conducting a search.'" *United States v. Caldwell*, 7 F.4th 191, 200 (4th Cir. 2021) (quoting *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (*per curiam*)). Nevertheless, the automobile exception to the warrant requirement permits police officers to conduct a search of a vehicle where it is "readily mobile and probable cause exists to believe it contains contraband." *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 393, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985)). *See also, Caldwell*, 7 F.4th 191, 200 (4th Cir. 2021) (concluding pursuant to the automobile exception that probable cause to believe a vehicle contains contraband justifies "a warrantless search"). Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[O]nce police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'" *United States v. Kelly*, 592

14

F.3d 586, 590 (4th Cir. 2010) (quoting *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). *See also, Caldwell*, 7 F.4th at 200 (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)) ("[W]here the automobile exception applies, 'it justifies the search of every part of the vehicle.'").

   1. The officers developed probable cause to search after smelling an odor of marijuana emanating from Defendant's car.

In his motion to suppress, Defendant states that a "cop's belief he smelled marijuana does not per se establish probable cause to believe drug-related evidence is present." (Doc. 20, page 8). This position is directly contrary to Fourth Circuit authority on this issue. The Fourth Circuit has repeatedly held that the odor of marijuana alone can provide probable cause for a search of a vehicle. *United States v. Humphries*, 372 F.3d. 653, 658 (4th Cir. 2004); *see also United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002). While smelling marijuana does not guarantee that marijuana is still present, the odor certainly provides probable cause to believe that it is. *Humphries*, 372 F.3d. at 658. As the Fourth Circuit recently stated in *United States v. Harris,* "[w]e have repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place." *Harris,* 2025 WL 3296047(4th Cir. 2025 (unpublished)), citing *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020) (citation modified). Thus, marijuana odor emanating from a vehicle is sufficient to justify a law enforcement officer's probable cause search of that vehicle. *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016). Probable cause also exists should the officer make a reasonable mistake of fact in concluding that he smelled marijuana. See, *United States v. Heien*, 574 U.S. 54, 66-67 (2014) (finding that the Fourth Amendment tolerates reasonable mistakes, whether they are of fact or law, provided the

15

mistake is objectively reasonable).  Therefore, an officer's reasonable belief that they smelled marijuana continues to be sufficient to establish probable cause.[7]

Defendant also suggests that the officer's claim of smelling marijuana was written in his report only after discovering the marijuana and firearm in Defendant's vehicle, and "his [Officer DelCerro's] body worn camera footage does not include any verbalized marijuana odor detection prior to the search, nor did the automobile search generate other corroborating evidence for the claimed odor."  Doc. 20, page 9.  These claims are factually incorrect.

Less than one minute after making an investigative stop on Defendant, Officer DelCerro asked, "have you been smoking in the car?"  Officer DelCerro did not clarify whether he was asking about marijuana or legal tobacco products, but there would be no investigative value to asking about Defendant smoking legal tobacco products.  Additionally, as Officer DelCerro began searching the vehicle, but before marijuana was discovered in the vehicle, Officer Torres informed Defendant that "*immediately* [as officers approached the vehicle] *we smelled a strong order of marijuana ...*"[8]  This statement occurred shortly before the first bag of marijuana was discovered in Defendant's car.  While not necessary, both Officer DelCerro's question and Officer Torres' statement provide corroboration that both officers smelled marijuana as they approached Defendant's car.  Based on these facts, probable cause exists to search the vehicle.

## IV. CONCLUSION

Law enforcement had reasonable suspicion to conduct an investigative stop of Defendant.  Upon stopping Defendant, they detected the odor of marijuana coming from his vehicle.  This

---

[7] Defendant cites to numerous non-binding cases from other jurisdictions.  See, Doc. 20, page 8.  Defendant also cites to a *New York Times* article that does not involve the current case, nor any of the officers involved in the current case.
[8] Government Exhibit 2, 1:56:17 pm.

established probable cause to search Defendant's vehicle under the automobile exception. Defendant's Motion to Suppress should be denied in its entirety.

Since both the stop of Defendant and the search of his vehicle were legal, the exclusionary rule does not apply.

Respectfully submitted on this 29th day of May 2026.

RUSS FERGUSON
UNITED STATES ATTORNEY

**/s/ Alfredo De La Rosa**
Assistant United States Attorney NC
TX Bar Number: 24075486
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202
Telephone: 704.227.0226
E-mail: alfredo.de.la.rosa@usdoj.gov

## A.I. CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

*/s/ Alfredo De La Rosa*
Assistant United States Attorney
